**AFFIRMED and Opinion Filed April 22, 2021**



In The
**Court of Appeals**
**Fifth District of Texas at Dallas**

**No. 05-20-01056-CV**

**IN THE INTEREST OF C.C. AND F.C., CHILDREN**

**On Appeal from the 354th Judicial District Court**
**Hunt County, Texas**
**Trial Court Cause No. 87760**

## MEMORANDUM OPINION
Before Chief Justice Burns, Molberg and Nowell
Opinion by Chief Justice Burns

Father challenges the legal and factual sufficiency supporting a jury's determination that he engaged in conduct justifying termination of his parental rights. We affirm.

Immediately following CC's birth in August 2018, CPS investigated allegations of domestic violence between Father and Mother[1] and concerns regarding substance abuse by both. A CPS investigator, Kevin Wolfe, met with both parents at the hospital and testified Father had scratches on his face and Mother had a fist-sized bruise on her leg. Both parents claimed their injuries were caused by a

---

[1] To protect the identity of the children, we use pronouns for both parents and initials for each child. *See* TEX. R. APP. P. 9.8(b) (2).

large pig that lived at their residence, although based on his training and experience, Wolfe believed Father and Mother caused the other's injuries. At the hospital, Father refused an oral swab drug test and told Wolfe he would not cooperate without a court order. Hospital security escorted Father from the premises after Father's father interrupted Wolfe's interview and both Father and Grandfather became aggressive and threatening towards Wolfe.

Mr. Wolfe instituted a child safety plan pursuant to which Father could have no contact with CC until the substance abuse allegations were cleared up. Both parents agreed to the safety plan. Father's sister agreed to serve as the supervisor in the original child safety plan.[2] Mother planned to live with Sister who would ensure Father had no contact with Mother or CC until the substance abuse allegations were resolved. When Wolfe visited Mother at Sister's home, a few weeks after the hospital visit, Mother cried and admitted she and Father argued, but did not make an outcry regarding abuse by Father. Wolfe's concerns about domestic abuse were not alleviated.

Wolfe also visited Father, who was living with his parents at the residence where Father wanted Mother and CC to live. Because of the threatening incident at the hospital as well as Grandfather's criminal history discovered by Wolfe, before visiting, Wolfe ran a background check on Father and discovered previous charges

---

[2] Mother's mother was not a suitable caregiver for CC because of her own history with CPS.

of violence asserted against Father. At the residence, Wolfe, who was accompanied by sheriff's deputies, observed broken lawn equipment littering the yard area, and multiple cats, dogs, and a large unrestrained pig wandering around near the residence entrance. Inside, Wolfe noted the concrete floor was littered with feces and trash, saw an additional eight cats and dogs inside the residence, and smelled a foul odor. An unidentified male who appeared to live in a small room at the home left immediately once he saw Wolfe and the deputies. Wolfe concluded the house was wholly inappropriate for a newborn baby.

While the safety plan was in force and while Wolfe was visiting a local pediatrician's office to obtain medical records for another case, Wolfe observed Father, Mother, and CC in the waiting room. The parents, who said they were at the office for CC's first pediatric appointment, acknowledged they were violating the safety plan and agreed to follow Wolfe to CPS for an interview in which Wolfe's supervisor also participated. At CPS's office, Father admitted to having used methamphetamine the day of the interview or several days previously, admitted he had been a continuous meth user for his entire adult life and needed help with his addiction, admitted his family used meth, and allowed an oral swab drug test. Wolfe concluded Father's untreated and unabated drug use endangered CC and rendered Father unable to care for CC.

CPS was unable to identify a suitable person to supervise the safety plan, and thus allowed Mother and CC to return to Sister's home. Both parents, however, were asked to take urinalysis drug tests. Rather than returning to Sister's home Mother took CC to live in Terrell for about a month where Wolfe was unable to interview her due to Mother's lack of cooperation. Eventually together with Father, Mother and CC left the Terrell residence—another violation of the safety plan—and despite the efforts of three CPS special investigators and the assistance of law enforcement, were not located for approximately one and a half months. Wolfe discovered that while Mother and Father were hiding from CPS, they had stayed some time at the residence Wolfe had already determined was inappropriate for CC.

CPS filed this proceeding, and following a hearing, became the temporary managing conservator for CC and FC.[3] Gina Gainer, the caseworker assigned to the family, also testified at trial. Ms. Gainer told the jury about the Family Based Safety Services (FBSS) CPS makes available to parents whose behavior has resulted in investigations and intervention, like Mother and Father. She discussed the wide range of services offered to parents, including parenting classes; substance abuse counseling; individual or couples therapy; anger management programs; domestic violence counseling; and play therapy for children, all designed to effect positive

---

[3] Mother, who was 18 or 19 when CC was born, had also been removed from her mother and grown up in CPS's care. She had only recently aged out of foster care, although Mother kept in contact with her CASA worker. No adults in either of CC's parent's lives were qualified to serve as supervisor or foster parents for CC.

4

behavioral changes, keep families together, and avoid court intervention. Once parents agree to the recommended services, Gainer said CPS cases were transferred from investigations to the FBSS unit. Father and Mother agreed to complete random drug testing, cooperate with substance abuse assessment and follow recommendations from a substance abuse counselor, receive and follow recommendations from mental health evaluations, and participate in parenting classes[4] and individual and couple's counseling. Gainer testified the primary issue Mother and Father's services was intended to address was their substance abuse.

Although the parenting classes and counseling services were offered across the street from where the couple were living at the time, they completed only one newborn class, and Father completed one counseling session during a four month period. The drug testing site was also across the street from where the couple were living, although the substance abuse counseling was in downtown Dallas.[5] Father and Mother tested negative for illegal drugs in April and May 2019, but refused to take drug tests in June 2019. Gainer stated Father failed to complete any of the substance abuse counseling sessions, despite efforts by the provider to accommodate his work schedule and Gainer's offers to provide them transportation. Based on

---

[4] Gainer deemed the parenting classes especially important for Mother and Father since both were very young, CC was their first child, and he was still a newborn.

[5] The couple was living in Greenville, Texas.

Mother and Father's lack of participation in the FBSS, Gainer testified they "had little to or no motivation" to obtain CC's return to their care.

In June 2019, Gainer learned that Mother was 18 weeks pregnant with FC when Mother went to the hospital due to pain, and tested positive for substances. Father admitted to Gainer that he thought Mother was having a miscarriage and had forced her to smoke marijuana so she would relax. During a home visit, she also observed that Mother had a black eye and Father's hand was broken, leading to further suspicions of domestic violence. Gainer said she verified the domestic violence with Father's employer, (who was also his sister) and based on her training and experience concluded Mother was a victim of Father's violence. Mother, however, declined domestic violence services. In her testimony, Gainer also said during home visits when she discussed his lack of progress on completing services, Father became combative and uncooperative, frequently yelling and cursing at her. In July 2019, the case was transferred from FBSS to a legal case.

Barbara Bowers, a licensed chemical dependency counselor, testified that on March 5, 2019, she conducted a chemical dependency evaluation on Father, who was 31 years old at that time. As he had told Mr. Wolfe, Father confirmed his use of methamphetamine and marijuana for approximately six years, stated his most frequent use was daily but said he had not used since December 2018. Father said he had not participated in any treatment program and did not attend Narcotics

6

Anonymous. Based on her evaluation and observations, Ms. Bowers classified Father as an addict but said he was in denial about the severity and consequences of his drug use. Ms. Bowers informed Ms. Gainer and Father of her specific recommendations for his treatment, including attending 12 weekly intensive substance abuse sessions, AA or NA meetings three times per week, and abstaining from drugs and alcohol. Ms. Bowers tried contacting Father several times to provide opportunities for the recommended counseling, but Father never responded and never provided any proof that he attended AA or NA meetings.

Ms. Bowers testified that Father also admitted he had been arrested four times for domestic violence and once for violating a restraining order. She informed the jury that Father needed on-going services for drug treatment and if he was using methamphetamine and marijuana was incapable of supervising an infant or toddler.

The Department also provided the testimony of Ms. Victoria Shabanaj, who was the conservatorship caseworker assigned to CC and FC once the legal proceeding was filed. Ms. Shabanaj informed the jury about CPS's safety concerns and the Family Plan of Service. The Temporary Orders required Mother and Father to comply with the Plan to alleviate the safety concerns and prove their ability to care for and parent the children and meet the children's needs in the future. She discussed the Plan with both parents, explaining that in addition to completion, lifestyle changes were required. Ms. Shabanaj testified that based on her

7

communications with Father, she knew he understood what was required of him. Additionally, both parents signed the Plan. She explained that in phase one of the Plan, Father was asked to work with a different drug counselor since he had not complied with Ms. Bower's requests, but required to perform the same intensive outpatient program, counseling and AA/NA services. Father did not complete the drug counseling program, however, and was again dismissed for noncompliance. Ms. Shabanaj testified she had received no indication that Father had engaged in any services for the six months before the trial. Father completed a Father's Focus parenting class, but failed to participate in a Batterers Intervention Prevention Program (BIIP) he was ordered to complete. She also described Father's failure to successfully complete several of the random drug tests he was ordered to provide, including one incident in which he was asked to leave the testing facility in May 2020 because of hostility while at the facility.

Ms. Shabanaj testified that multiple permanency hearings had been conducted during which the Family Plan of Service was discussed. At the last such hearing, thirteen months after the case was filed, Father appeared and was represented by counsel. During the hearing, Father was ordered to take a drug test within 24 hours. Because he was out of state at the time of the hearing, the judge allowed Father seven days to complete the test. Father, however, did not take the drug test and his visitation with the children was suspended for the five months before trial, from May

8

2020 to late October 2020. Further, Ms. Shabanaj testified that for the year preceding trial, Father had failed to provide a work schedule, a pay stub, or any indication of employment.

Before his visitation was suspended, Ms. Shabanaj observed several of Father's visits with CC, during which he attempted to correct age-appropriate behavior by CC, stated CC had been spoiled, and CC's behavior would not be acceptable when he returned home. She testified that Father became easily frustrated with his children, was unable to redirect them or show patience, and failed to demonstrate anything he had learned in the parenting class, all of which was very concerning to Ms. Shabanaj given that the visits were only two hours long. And, because Father failed to provide his home address, CPS was unable to view Father's home and determine whether it was safe for the children.

Ms. Shabanaj also testified about the number of sessions in the programs Father was ordered to complete, described most programs as requiring several months to complete, and Father's obligation to pay for the BIIP services. Additionally, she said Father had reported difficulty completing services because of conflicts with his work schedule, but also described the proximity of some of the programs to Father's location in Greenville, and explained that some programs allowed virtual attendance following Covid-19 restrictions. She also explained that she would have offered Father transportation assistance for getting to the drug tests

9

he had missed, but had difficulty communicating with Father because when she called the number he provided she was told he wasn't available or wasn't at that number. Ms. Shabanaj confirmed that as provided in the Plan, she had explained to Father multiple times that failure to successfully complete the FBSS services, including the drug plans, and failure to demonstrate major lifestyle changes placed him at risk for having his rights to his children reduced, restricted, or terminated. Based on certified copies of criminal judgments, she also described Father's criminal convictions, including one for endangering a child.

Finally, Ms. Shabanaj testified about her visits to the foster parents' home and her positive assessment of their parenting skills, their strong bonding with the children, the stability of the placement, and because of their age, FC and CC's total dependency on their caretakers.

Based on all of her interactions with Father, including his failure to consistently demonstrate sobriety, Ms. Shabanaj stated that in her opinion Father could not provide CC and FC a safe environment and termination of his parental rights was in CC and FC's best interests.[6] Ms. Shabanaj explained why terminating Father's parental rights and having CPS named permanent managing conservator was in the children's best interests. According to Ms. Shabanaj, absent termination,

---

[6] Pursuant to an affidavit of relinquishment acknowledged in an Interlocutory Order of Termination, Mother voluntarily relinquished her parental rights to both of her children.

10

adoption was not an option and CPS would remain in charge of raising CC and FC, which she agreed would be a terrible outcome for the children.

In addition to counsel for CPS, counsel for the foster-parents and the ad litem attorney, Father's counsel also appeared and cross-examined witnesses. Father, however, did not appear for trial and offered no witnesses or evidence controverting the Department's case. Premised on instructions regarding the predicate acts listed in section 161.001(b) (1) (D), (E), (N), and (O) of the family code[7] and the factors relevant to the children's best interests, the jury determined the parent-child relationship between Father and CC and Father and FC should be terminated. The trial court subsequently entered a judgment terminating Father's parental rights to CC and FC, and this appeal followed.

---

[7] "(b) The court may order termination of the parent-child relationship if the court finds by clear and convincing evidence: (1) that the parent has: . . . (D) knowingly placed or knowingly allowed the child to remain in conditions or surroundings which endanger the physical or emotional well-being of the child; . . . (E) engaged in conduct or knowingly placed the child with persons who engaged in conduct which endangers the physical or emotional well-being of the child; . . . (N) constructively abandoned the child who has been in the permanent or temporary managing conservatorship of the Department of Family and Protective Services for not less than six months, and:(i) the department has made reasonable efforts to return the child to the parent; (ii) the parent has not regularly visited or maintained significant contact with the child; and (iii) the parent has demonstrated an inability to provide the child with a safe environment; (O) failed to comply with the provisions of a court order that specifically established the actions necessary for the parent to obtain the return of the child who has been in the permanent or temporary managing conservatorship of the Department of Family and Protective Services for not less than nine months as a result of the child's removal from the parent under Chapter 262 for the abuse or neglect of the child"). TEX. FAM. CODE § 161.001.

**DISCUSSION**

Father raises no argument regarding the sufficiency of the evidence supporting the predicate grounds for termination. Instead, in a single issue, Father challenges only the legal and factual sufficiency of the evidence supporting termination being in CC's and FC's best interests. He argues the jury erred in concluding termination was appropriate because he contends CPS failed to satisfy its burden regarding the children's best interests and instead relied disproportionately on how well the children were doing in their foster placement and their bonding with the foster family. Father's argument, however, ignores significant evidence supporting endangerment.

**A.    The burden of proof and standard of review**

Parental rights are appropriately terminated when the movant provides clear and convincing evidence that a parent has committed one predicate act prohibited by section 161.001(1) of the family code and termination is in the best interest of the child. TEX. FAM. CODE § 161.001(1), (2); *In re J.O.A.,* 283 S.W.3d 336, 344 (Tex. 2009); *In re A.V.,* 113 S.W.3d 355, 362 (Tex. 2003). Clear and convincing evidence means that "measure or degree of proof that will produce in the mind of the trier of fact a firm belief or conviction as to the truth of the allegations sought to be established." TEX. FAM. CODE § 101.007; *In re K.L.B.*, No. 05-01-01924-CV, 2002 WL 31388776, at *1 (Tex. App.—Dallas Oct. 24, 2002, no pet.) (mem. op.).

12

The heightened burden of proof informs the standard we utilize in reviewing the trial court's decision. In reviewing termination findings, we determine whether "the evidence is such that a factfinder could reasonably form a firm belief or conviction about the truth of the . . . [movant's] allegations." *In re C.H.*, 89 S.W.3d 17, 25 (Tex. 2002). In determining whether the evidence is factually sufficient to support the termination of a parent-child relationship, we perform "an exacting review of the entire record." *In re A.B.*, 437 S.W.3d 498, 500 (Tex. 2014). Although we appreciate the "constitutional magnitude" afforded parental rights, we also recognize the imperative that the "emotional and physical interests of the child not be sacrificed merely to preserve that right." *In re C.H.*, 89 S.W.3d at 26.

## B. Legal and factual sufficiency

When evaluating evidence for legal sufficiency under a clear and convincing standard, we review all the evidence in the light most favorable to the finding to determine whether a reasonable factfinder could have formed a firm belief or conviction that the finding was true. *See In re J.F.C.,* 96 S.W.3d 256, 266 (Tex. 2002); *In re J.O.A.*, 283 S.W.3d at 345. We resolve disputed fact questions in favor of the finding if a reasonable factfinder could have done so, and we disregard all contrary evidence unless a reasonable factfinder could not. *City of Keller v. Wilson,* 168 S.W.3d 802, 817 (Tex. 2005); *In re J.F.C.,* 96 S.W.3d at 266. We also recognize that only the trier of fact judges the witnesses' credibility and resolves any conflicts

13

between the testimonies of different witnesses. *City of Keller,* 168 S.W.3d at 819; *In re R.W.,* 129 S.W.3d 732, 742–43 (Tex. App.—Fort Worth 2004, pet. denied) (jury was free to disbelieve father's assertion that he did not sexually abuse child).

## C.      Best interests of the children

"'[B]est interest'" is a term of art encompassing a much broader, facts-and-circumstances based evaluation [than a finding of harm or neglect, and] . . . is accorded significant discretion." *In re Lee*, 411 S.W.3d 445, 460 (Tex. 2013). We presume two conditions are in a child's best interest: (1) prompt, permanent placement in a safe environment; and (2) remaining with the child's natural parent. TEX. FAM. CODE § 263.307(a); *Interest of A.J.R.*, No. 14-18-00951-CV, 2019 WL 1523586, at *6 (Tex. App.—Houston [14th Dist.] Apr. 9, 2019, pet. denied) (mem. op.). A parents' best interests has no role in the analysis. *In re K.L.B.*, 200 WL 31388776, at *2. Evidence demonstrating endangerment informs the analysis of whether termination serves a child's best interest. *In re C.H.*, 89 S.W.3d 17, 28 (Tex. 2002); *Holley v. Adams,* 544 S.W.2d 367, 370 (Tex.1976). Further, a parent's past conduct provides a persuasive measure for future conduct regarding a child's best interests. *In re M.F.*, No. 01-17-00835-CV, 2018 WL 1630180, at *6 (Tex. App.—Houston [1st Dist.] Apr. 5, 2018, pet. denied) (mem. op.).

Relevant factors include: 1) the child's desires; 2) the child's emotional and physical needs now and in the future; 3) the emotional and physical danger to the

14

child now and in the future; 4) the parental abilities of the individuals seeking custody; 5) the programs available to assist these individuals to promote the best interest of the child; 6) the individuals' or the agency's plans for the child; 7) the home's or proposed placement's stability; 8) the parent's acts or omissions that indicate an improper parent-child relationship; and 9) any excuse for the parent's acts or omissions. *Holley,* 544 S.W.2d at 371–72; *In re D.W.*, 445 S.W.3d 913, 925 (Tex. App.—Dallas 2014, pet. denied). These non-exclusive factors provide guidance rather than a check-list. *In re C.H.,* 89 S.W.3d at 27. The absence of evidence supporting some factors will not preclude the fact finder from forming a strong conviction that termination is in the child's best interest, "if the evidence was undisputed that the parental relationship endangered the safety of the child." *Id.* We consider each applicable factor.

### 1. The children's desires

Our record does not include specific evidence regarding the children's desires. CC and FC were both very young, two and one respectively at the time of trial. CC had spent half of his life and FC had spent the entirety of her life with the same foster parents. The evidence demonstrated both were doing "exceptionally well" in their "rock solid" foster placement, the foster parents had good parenting skills, both children had strong loving bonds with their foster parents, and the foster parents wanted to adopt both children. In contrast, Father had not seen the children for more

15

than five months and his visitation had been suspended due to his refusal to take drug tests. The jury could accordingly infer the children's desires from this evidence. *See In Interest of K.M.*, No. 07-16-00120-CV, 2016 WL 3660076, at *4 (Tex. App.—Amarillo June 29, 2016, pet. denied) (mem. op.) (inferring young children's desires from lengthy placement with stable foster family and positive circumstances regarding the foster placement); *In re J.M.*, 156 S.W.3d 696, 706 (Tex. App.—Dallas 2005, no pet.) (desires of children too young to express them inferred from evidence showing children were bonded to both father and foster family, enjoyed visitations with father, and were happy in the foster home). Moreover, even if we found any evidence suggesting CC and FC desired Father's continued presence in their lives, we would conclude those desires were outweighed by Father's conduct that endangered their well-being. *See In re J.M.T.*, 519 S.W.3d 258, 270 (Tex. App.—Houston [1st Dist.] 2017, pet. denied) (noting that young age of child—fourteen months at time of trial—weighed in favor of trial court's finding that termination was in child's best interest); *In re J.J.S.*, No. 14-17-00359-CV, 2017 WL 4518595, at *11 (Tex. App.—Houston [14th Dist.] Oct. 10, 2017, pet. denied) (mem. op.); *In re D.W.*, 445 S.W.3d at 926 ("evidence that a child loves a parent and enjoys visits is only marginally relevant to a best interest"). The children's desires support termination as in CC's and FC's best interests.

**2.      The children's emotional and physical needs and emotional and physical danger, now and in the future**

We analyze jointly the second and third factors, the present and future emotional needs of and danger to the children, since both underlie the basis for terminating Father's rights.  Father's dangerous conduct in continuing his frequent and long-term drug use; the unsuitability of the home in which he intended the children to reside; failing to take requested drug tests or work the services offered by CPS; conviction for endangering a child; and, propensity for violence as evidenced by his prior domestic violence arrests and the likelihood that he was continuing to abuse Mother, all suggested he had endangered CC and FC in the past and would continue to do so in the future.  *See In re A.L.*, 545 S.W.3d 138, 149 (Tex. App.—El Paso 2017, no pet.) (failure to utilize available programs creates inference of parent's inability to improve unacceptable conduct); *Toliver v. Tex. Dep't of Family and Protective Servs.*, 217 S.W.3d 85, 102 (Tex. App.—Houston [1st Dist.] 2006, no pet.) (frequent and long–term drug use endangering child's welfare relevant to best interests); *In re C.A.J.*, 122 S.W.3d 888, 893 (Tex. App.—Fort Worth 2003, no pet.) (parent's inability to provide adequate care for children, unstable lifestyle, lack of parenting skills, and poor judgment relevant to children's best interests); *In re J.N.R.*, 982 S.W.2d 137, 143 (Tex. App.—Houston [1st Dist.] 1998, no pet.) (parent's "consistent inability to avoid criminal activity implies a conscious disregard for his parental responsibilities.").

17

Father asserts no evidence was presented that he posed a danger if he continued as a possessory conservator. On the contrary, however, evidence that Father's conduct endangered CC and FC negates his fitness to continue in any role in their lives. *See* TEX. FAM. CODE § 153.191 ("The court shall appoint as a possessory conservator a parent who is not appointed as a sole or joint managing conservator unless it finds that the appointment is not in the best interest of the child and that parental possession or access would endanger the physical or emotional welfare of the child."). Moreover, Father's argument ignores Ms. Shabanaj's testimony that CPS would bear responsibility for the children's upbringing—which she described as a terrible outcome—since absent termination, adoption was not possible.

Notably, while compelling evidence supporting just the second and third factors suffices to demonstrate termination was in the children's best interests, *see In re C.H.*, 89 S.W.3d at 27 ("undisputed evidence of only one factor may be sufficient to support a finding that termination is in the best interest of the child"), ample evidence supports the additional factors.

### 3. The parties' respective parenting abilities and programs available to assist the parties to promote the children's best interests

The fourth factor, the parenting abilities of the parties, likewise supports termination. Several considerations inform this factor, including parenting skills and judgment, lack of motivation to improve poor parenting skills, and a parent's past

neglect or past inability to meet the physical and emotional needs of the children are also relevant. *In re J.D.*, 436 S.W.3d 105, 119 (Tex. App.—Houston [14th Dist.] 2014, no pet.); *Wilson v. State*, 116 S.W.3d 923, 930 (Tex. App.—Dallas 2003, no pet.); *In Interest of K-A.B.M.*, 551 S.W.3d 275, 288–89 (Tex. App.—El Paso 2018, no pet.). We pair our consideration of the fourth factor with the fifth; programs available to assist Father.

Here, the jury heard testimony of Father's drug dependency and inability to care for small children. Further, Ms. Shabanaj testified that she was unable to visit Father's current home because he had not provided an address. Similarly, despite several requests, Father failed to provide proof of income so that Ms. Shabanaj could confirm his ability to provide for the children. Father's failure to accept and complete counseling services and cooperate with CPS's supervision also demonstrates termination was in CC and FC's best interests. *See In re T.D.L.*, No. 2-05-250-CV, 2006 WL 302126, at \*9 (Tex. App.—Fort Worth Feb. 9, 2006, no pet.) (mem. op.) (considering mother's failure to utilize drug treatment program and parenting classes offered to her); TEX. FAM. CODE § 263.307 (b) (10) (the willingness and ability of the child's family to seek out, accept, and complete counseling services and to cooperate with and facilitate an appropriate agency's close supervision). Additionally, although Father completed a Focused Fatherhood class, in visits observed by Ms. Shabanaj, Father told CC to stop behaving as a typical eleven month

19

old would—wiggling, jumping, playing loudly and throwing tantrums. Father told CC he had become spoiled and his behavior would not be accepted when CC returned home, despite Ms. Shabanaj telling Father that CC's behavior was appropriate. From these observations, Ms. Shabanaj concluded that Father had not changed his behavior despite the class and characterized his parenting ability as "concerning, inconsistent, inappropriate." In contrast, Ms. Shabanaj said the foster parents had "more than adequate" parenting abilities, a strong support system, and were able to provide not only for the children's basic needs, but their emotional needs as well.

Although Father complained that he was unable to complete the service plans because of his work schedule, evidence also demonstrated CPS arranged services to accommodate Father's work schedule and offered him transportation when his car broke down, but Father did not avail himself of these accommodations. A reasonable fact finder could have resolved any conflict regarding the sixth factor against Father, and concluded as we do, that this factor favored termination.

### 6. The parties' respective plans for the children and stability of proposed placement

We consider the sixth and seventh factors collectively, acknowledging the importance of a stable home environment and whether the parties' parenting and supervision plans are realistic and well-defined. *In re J.D.*, 436 S.W.3d at 120; *see also In re M.F.*, 2018 WL 1630180, at *6 (court may consider "circumstantial

20

evidence, subjective factors, and the totality of the evidence" as well as evaluating parent's future conduct by comparing it with past conduct). Stability and permanence are vital to raising healthy children, thus rendering those factors important in determining whether termination is in a child's best interests. *In re J.D.*, 436 S.W.3d at 120.

Father provided no evidence regarding his plans for CC and FC, and the only evidence regarding the home he offered showed that it was wholly inappropriate for children. In contrast, CPS's plan following termination was adoption by the foster parents, with whom CC had lived for more than half of his life and FC had lived for her entire life. Ms. Shabanaj characterized the foster home as "rock solid," and the CASA worker testified the foster home was very stable, loving, and supportive. The foster mother testified about her and her husband's stable employment, their loving bond with both children, utilization of early childhood intervention evaluations to ensure both children were developmentally on-target, and the regular care the children received from a pediatrician and dentist. She stated she and her husband's plan for the children was adoption, providing the children every opportunity to participate in activities, ensuring a great education, and assisting the children in becoming "successful members of society." A reasonable fact-finder could only have concluded these factors rendered termination in CC and FC's best interests.

**7.    Parent's acts or omissions relevant to existing parent-child relationship and any related excuses**

We also consider the final two factors together. The same facts relevant to endangerment, as well as the evidence related to factors two and three above inform this factor. *See In re J.D.*, 436 S.W.3d at 121 (discussing endangering child abuse by mother regarding this factor). We conclude Father's actions in intentionally violating the safety plans, his admission of frequent, continued and untreated drug use and failure to complete court-ordered services, his criminal history which included convictions for endangering a child and four arrests for domestic violence support termination pursuant to these factors.

Moreover, we reject Father's argument that CPS failed to present evidence demonstrating that Father's drug use was a concern at the time of trial. CPS demonstrated Father was drug dependent and failed to participate in counseling or take requested drug tests. The refusal to test supports an inference of continued use. *In re R.M.C.*, No. 04-18-00706-CV, 2019 WL 1370367, at *3 (Tex. App.—San Antonio Mar. 27, 2019, pet. denied) (mem. op.); *In re W.E.C.*, 110 S.W.3d 231, 239 (Tex. App.—Fort Worth 2003, no pet.) (recognizing that fact finder could reasonably infer that parent's failure to complete scheduled screenings indicated she was avoiding testing because she was using drugs).

Utilizing the appropriate standards and considering the appropriate evidence for father's legal and factual sufficiency challenges, we conclude a reasonable fact

22

finder could have formed a firm belief or conviction that termination was in the best interests of CC and FC. We overrule Father's sole issue and affirm the judgment.

/Robert D. Burns, III/
ROBERT D. BURNS, III
CHIEF JUSTICE

201056F.P05



## Court of Appeals
## Fifth District of Texas at Dallas

**JUDGMENT**

IN THE INTEREST OF C.C. AND
F.C., CHILDREN

No. 05-20-01056-CV

On Appeal from the 354th Judicial
District Court, Hunt County, Texas
Trial Court Cause No. 87760.
Opinion delivered by Chief Justice
Burns. Justices Molberg and Nowell
participating.

In accordance with this Court's opinion of this date, the judgment of the trial court is **AFFIRMED**.

Judgment entered April 22, 2021.